[C.A. No. 13-3500 (RMB/JS), Doc. No. 163]
[C.A. No. 13-3715 (MAS/JS), Doc. No. 231]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

SAM YOUNES, et al.,

                    Plaintiffs,

                                    Civil No. 13-3500 (RMB/JS)

        v.


7-ELEVEN, INC.,

                    Defendant.


7-ELEVEN,

                    Plaintiff,

                                    Civil No. 13-3715 (MAS/JS)

        v.


KARAMJEET SODHI, et al.,

                    Defendants.


NEIL NAIK, et al.,

                    Plaintiffs,

                                    Civil No. 13-4578 (RMB/JS)

        v.


7-ELEVEN, INC.,

                    Defendant.


**<u>OPINION</u>**

    Nothing would please the Court more than if it did not have

to decide the present motion for sanctions filed by plaintiffs

1

Sam Younes and Tamar Atalla. The resources of the parties and Court can be better spent than having to devote enormous chunks of time on a matter not directly relevant to the merits of the case. Nevertheless, the detailed discussion herein is necessary to justify the sanctions to be imposed and to deter similar objectionable conduct.

This matter is before the Court on the Younes plaintiffs' Motion for Sanctions.[1] The motion has been extensively briefed, argued and supplemented. Plaintiffs are 7-Eleven franchisees. Their "theory of the case" is that 7-Eleven wrongfully targeted certain South Jersey franchises for termination, including their stores, in violation of their franchise agreements. Plaintiffs contend that 7-Eleven referred to this effort by various names but all with the same connotation, _e.g._, Operation Philadelphia, Project P, Project Philly, Philly Project, Project Philadelphia, Philadelphia Project, Operation Take Back, etc.[2]

---

[1] These three cases all involve 7-Eleven franchisees and have been consolidated for discovery and case management purposes. This motion was filed in Younes (C.A. No. 13-3500), and was later joined in by the Sodhi franchisees (C.A. 13-3715). The Naik franchisees (C.A. 13-4578) did not join in plaintiffs' motion. The Younes plaintiffs (Younes and Atalla) have taken the laboring oar on the discovery squabbles discussed herein. For ease of reference when the Court refers to plaintiffs it will be collectively referring to Younes and Atalla. All references to docket numbers ("Doc. No.") shall refer to C.A. No. 13-3500.
[2] The Court will use the term "Project P" which shall include all related references unless otherwise noted.

Although the parties squabbled over many discovery issues, the focus primarily involved plaintiffs' contention that 7-Eleven obstructed discovery and violated Court Orders regarding Project P. 7-Eleven's description of Project P has morphed over the years.[3] The Court understands 7-Eleven now contends that Project P was an effort to staff stores where franchisees were going to be terminated because they committed fraud. Plaintiffs contend Project P was a nefarious effort to terminate weak South Jersey franchises and owners who complained about the company, to squelch "vocal" franchisees, and to "churn" franchises to earn more fees.[4] Plaintiffs' motion seeks to strike 7-Eleven's answer and an award of fees and costs.

For the reasons to be discussed, plaintiffs' motion is GRANTED in part and DENIED in part. The Court finds that 7-Eleven violated Fed. R. Civ. P. 26(g) and 37(b)(2), that its conduct was not substantially justified, and no circumstances exist to make an award of expenses unjust. As a result, 7-Eleven will be sanctioned for its discovery transgressions. However, the Court will not strike 7-Eleven's answer. Instead, the Court admonishes 7-Eleven and Orders it to pay the reasonable

---

[3] At various times 7-Eleven used the terms "accountability project," "accountability effort" and "staffing initiative." These terms were used before plaintiffs and the Court learned that 7-Eleven's documents and ESI repeatedly used the term Project P and its various derivatives.
[4] Some franchisees also complain 7-Eleven discriminated against certain ethnic groups.

expenses, including attorney fees, plaintiffs incurred to obtain the discovery responsive to the Court's October 16, 2014 Order.

<u>Background</u>

A detailed background must unfortunately be provided to give the true flavor of what happened here. The case has been plagued by discovery disputes largely concerning Project P. Having refereed the parties' numerous disputes the Court is left with the inescapable conclusion that much of the acrimony would not have occurred had 7-Eleven simply done what it was supposed to do.[5]

The Court starts at the beginning. Plaintiffs Younes and Atalla own and operate four (4) 7-Eleven stores or franchises in South Jersey. They generally alleged in their state court complaint removed to this Court on June 6, 2013, that 7-Eleven breached their franchise agreements. Plaintiffs filed their

---

[5] The Court summarized the history of the case when it denied 7-Eleven's motion for an extension of time to complete discovery:

> After exhaustive efforts the fact discovery phase of the case is finally coming to a close. What is apparent from the tortured discovery phase of the case is that the case is a prime example of how litigation should not be conducted. The parties have been unable to agree on simple issues, and the Court has been plagued by incessant discovery disputes, many of which have been trivial. If the parties had timely and appropriately responded to each other's discovery requests, fact discovery would have been completed long ago.

<u>Younes, et al. v. 7-Eleven, Inc.</u>, C.A. 13-3500 (RMB/JS), 2015 WL 4496621, at *1 (D.N.J. July 22, 2015).

complaint because they believed 7-Eleven intended to terminate their franchises or make their business relationship so hostile as to force them to give back their franchises or frustrate their ability to succeed.

Importantly, plaintiffs' complaint specifically pleaded that 7-Eleven schemed to illegally terminate their franchises. Plaintiffs alleged as follows:

> 17. The convenience store business in Southern New Jersey has become dominated by a competitor of 7 Eleven. Defendant [7-Eleven] has failed to change its stores, products, and marketing despite the ever changing market and the expectations of consumers. Due to the competition, and the lack of a response by 7-Eleven to the competition, Plaintiffs' gross sales and net profits have been down, and Defendant's gross sales and net profits are also believed to be down.

> 18. Defendant has blamed Plaintiffs for this downturn in sales.

> 19. Plaintiffs believe and therefore aver that Defendant has devised a plan to terminate the Franchise Agreement with each of the Plaintiffs. The plan is twofold: (1) to make the business conditions so hostile that Plaintiffs will each want to terminate the franchise agreement; and (2) to create artificial and false evidence that Plaintiffs have violated the Franchise Agreement as a way to intimidate the Plaintiffs into surrendering the franchise.

> 20. It is believed and therefore averred that Defendant has used intimidation tactics or unfair practices to terminate a number of other franchises in the South New Jersey region.

> 21. At least two of these former Franchisees were told by Defendant's agents that they were among the first to have their Franchise Agreement

terminated, and that Defendant was going to "take back" each store and terminate each and every Franchise Agreement in South Jersey.

22. A terminated franchise is a windfall to the Defendant.

23. When a franchise is terminated and then sold to a new franchisee, it is believed and therefore averred that Defendant also presents a different Store Franchise Agreement with terms that are more favorable to the Defendant; Defendant gets paid for the franchise again, and gets a new Franchise Agreement with more favorable terms.

Complaint ¶¶ 17-23. 7-Eleven contends it never sought or intended to terminate plaintiffs' franchises.

In addition to the allegations in their complaint, plaintiffs made it crystal clear at numerous conferences they were alleging that 7-Eleven targeted them and other franchisees for termination for non-legitimate business reasons such as the fact they had low volume and aging stores, they were vocal in the Franchise Owner's Association, and they were critical of 7-Eleven's policies and practices. This, plaintiffs contend, violated their franchise agreements and breached 7-Eleven's implied covenant of good faith and fair dealing.[6] The fact that

---

[6] See Carlo C. Gelardi Corp. v. Miller Brewing Co., 502 F. Supp. 637, 653 (D.N.J. 1980)("A franchisor is not permitted to accomplish a termination by indirect means that it would not be permitted to accomplish by direct means); Dunkin' Donuts Inc. v. Dough Boy Management, Inc., C.A. No. 02-243 (JLL), 2006 WL 20521, at *11 (D.N.J. Jan. 3, 2006)("It is without doubt that if a franchisor manipulates the system causing a franchisee's breach so that a Franchise Agreement is terminated, the

this has been plaintiffs' focus and theory of the case cannot be reasonably disputed.[7] Indeed, 7-Eleven knew this was the case when the parties served their July 16, 2013 Joint Discovery Plan. Therein the parties jointly listed the following subject area to be covered in discovery:

> (13) Whether there is any plan to terminate the Plaintiffs' Franchise Agreements that are inconsistent with the terms of the Franchise Agreements;

Plaintiffs also wrote that discovery would be taken on the following topics:

> (29) Whether Defendant has devised a plan to terminate the Franchise Agreement with each of the Plaintiffs by making the business conditions hostile that Plaintiffs have no choice but to terminate the franchise agreement;

> (30) Whether Defendant is using intimidation tactics or unfair practices as the means to terminate franchises in the South New Jersey region.

Plaintiffs' interrogatories 4 and 5 served in November 2013 sought discovery relevant to the claims in paragraphs 17-23 of their complaint. These interrogatories with 7-Eleven's January 15, 2014 responses follow:

<u>Interrogatory No. 4</u>

> Identify any and all policies, plans or internal communications relating to your efforts and/or intentions to terminate the Franchise Agreements with the Plaintiffs.

---

termination occurs without good cause in violation of NJFPA, N.J.S.A. §56:10-5."

[7] The <u>Naik</u> and <u>Sodhi</u> franchisees have been in lockstep with plaintiffs regarding these allegations.

Response to Interrogatory No. 4

7-Eleven made no efforts and had no intention to terminate its Franchise Agreements with Plaintiffs, except as stated in the Notices of Material Breach which were issued and served, and which are produced herewith.

Interrogatory No. 5

Identify any and all policies, plans or internal communications relating to your efforts and/or intentions to terminate other Franchise Agreements in South Jersey.

Response to Interrogatory No.5

In addition to the General Objections, Defendant objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and calls for information that (i) is neither relevant to the subject matter of the pending litigation nor likely to lead to the discovery of admissible evidence and (ii) constitutes confidential, proprietary business information belonging to 7-Eleven. Without waiving the General Objections or the foregoing specific objections, Defendant responds that its policies regarding the termination of franchises are set forth in the Franchise Agreements, copies of which are produced herewith.

See 7-Eleven's January 15, 2014 Responses to Plaintiffs' Interrogatories [Doc. No. 163-3].

Starting in the summer/fall of 2014 plaintiffs bombarded the Court with complaints about 7-Eleven's discovery responses. In particular, plaintiffs' focused on 7-Eleven's failure to produce documents regarding their plan or project to terminate stores in South Jersey. Numerous telephone and in-person conferences were held to address plaintiffs' complaints that

relevant documents and electronically stored information ("ESI") was not produced. Early on plaintiffs insisted that 7-Eleven formed a project called "Operation Philadelphia" to terminate franchises in its "Penn/Jersey Zone" which encompasses the South Jersey area where plaintiffs' stores are located. The term Operation Philadelphia was not pulled out of "whole cloth." Plaintiffs produced affidavits from two former 7-Eleven employees attesting to the fact that Operation Philadelphia existed. 7-Eleven repeatedly denied knowledge of Operation Philadelphia.

While their discovery disputes continued and intensified, relevant events occurred to bring the Operation Philadelphia dispute into sharper focus. On August 20, 2014, counsel met and conferred in-person regarding discovery disputes, on September 5, 2014 plaintiff served amended Rule 30(b)(6) topics of inquiry which specifically included the terms Operation Philadelphia and Project Philadelphia, and on September 8, 2014, plaintiff served 7-Eleven with John Spavlik's affidavit.[8] Spavlik worked as 7-Eleven's Field Consultant in the South Jersey market. Affidavit ¶ 2. Spavlik attested to the fact that 7-Eleven created a list of franchisees that were targeted for termination and the list was referred to as Operation Philadelphia. Spavlik also stated

---

[8] See September 8, 2015 Affidavit of John Spavlik [Doc. No. 153-1, Exhibit D].

the list was known to 7-Eleven and its attorneys. Id. ¶¶ 8-10.[9]
Also on September 8, 2014, plaintiffs demanded the production of
all documents related to Operation Philadelphia.

It was only after plaintiffs doggedly pursued Operation
Philadelphia or Project P discovery that 7-Eleven's discovery
position slowly evolved. After numerous discovery conferences 7-
Eleven grudgingly acknowledged it had a plan to terminate South
Jersey franchises. We now know that starting at least as early
as the 2011/2012 time period, 7-Eleven internally referred to
the plan as Project P or Project Philly. 7-Eleven now describes
Project P as an effort to staff stores where franchises were
going to be terminated because of alleged fraud. Plaintiffs have
a different slant. Plaintiffs claim Project P was an illegal
effort to terminate franchises consistent with their theory of
the case.

Given the content of the documents and ESI later produced
by 7-Eleven, there is no doubt that 7-Eleven viewed Project P as
an important and resource intensive project. Project P was
projected to be a multi-million dollar cross-functional project

---

[9] Later, plaintiffs produced the October 24, 2014 affidavit of
Ian Shehaiber. [Doc. No. 163-15]. Shehaiber worked as 7-Eleven's
Senior Field Consultant, Market Manager. Affidavit ¶ 1. He
attested to the fact that in July 2012, 7-Eleven put him in
charge of a special project called "Operation Take Back",
"Project P" or the "Philadelphia Project." Id. ¶ 12. The purpose
of the special project was to take back stores. Id. ¶ 13.

that involved multiple employees of the company, including high level executive, operations, human resource, asset protection and legal personnel. Indeed, Project P was designated as a "priority strategic project," numerous personnel were budgeted to devote substantial time to the project, and arrangements were in the works to hire and train scores of new store managers and assistant managers and hundreds of sales associates. Plaintiffs represent that at one time 7-Eleven estimated it would "take back" over 100 stores. Further, while the Court is not going so far as to say that 7-Eleven's outside defense counsel spearheaded Project P, there is no question from the produced documents and emails that they were involved in the planning, implementation and running of the project. The Court has already found that 7-Eleven's outside counsel played "prominent roles" in Project P. <u>See</u> August 19, 2015 Order (denying plaintiffs' motion to depose outside counsel). [Doc. No. 431].

The first production of Project P documents finally occurred on September 24, 2014, when 7-Eleven produced two (2) Project P spreadsheets (Deposition Exhibits P-26 and 33b)).[10] On October 13, 2014, the day before yet another conference to

---

[10] 7-Eleven's counsel stated that after it received Spavlik's affidavit on September 8, 2014 and it learned what plaintiffs meant by the term Operation Philadelphia, it investigated, uncovered and produced two documents mentioning "Project Philly" or "Philly Project." <u>See</u> October 10, 2014 Declaration ("Decl.") of S. Wiggins ¶11. [Doc. No. 130-2].

address Project P disputes, 7-Eleven supplemented its discovery responses to finally provide a tidbit of responsive information. See October 13, 2014 Response [Doc. No. 153-1, Exhibit F]. Without specifically referring to Operation Philadelphia or Project P, 7-Eleven's stated that from July 31, 2012 to October 31, 2012, it terminated ten (10) franchisees operating eighteen (18) stores. 7-Eleven also indicated that eleven stores operated by six discrete individuals were surrendered. 7-Eleven objected to producing additional information on the ground, inter alia, of relevancy, and because the discovery requested "confidential, proprietary and/or privileged information." Id.

Thus, up until the eve of the October 14, 2014 discovery conference, the following occurred: (1) 7-Eleven did not identify any effort to terminate franchises in its January 2014 responses to interrogatories 4 and 5; (2) 7-Eleven did not identify Project P in its January 2014 response to interrogatory 5 even though the project was directly responsive and the project involved substantial company resources and personnel, including 7-Eleven's trial counsel; (3) 7-Eleven delayed eight (8) months producing responsive Project P discovery that was readily available in January 2014; (4) after eight (8) months of repeated discovery squabbles regarding Project P, 7-Eleven only produced two responsive documents; and (5) 7-Eleven did not

provide any meaningful Project P answers to discovery until almost a year after plaintiffs' interrogatories were served.

At the October 14, 2014 conference the Court was thoroughly frustrated by 7-Eleven's obfuscation. As a result the Court issued an oral Order that it confirmed in its October 16, 2014 Order [Doc. No. 132]:

> By **October 28, 2014**, 7-Eleven shall produce the "Project Philly" information and documents Ordered to be produced at the October 14, 2014 conference. This includes the identities and positions of: the persons who established the project, the employees who ran the project, and all persons with material knowledge regarding the project, and in particular, the Younes, Sodhi, and Naik franchisees. 7-Eleven shall produce all summary reports regarding Project Philly that address or concern the information and preparation of the project, the implementation of the project, and the results of the project, and all documents specifically mentioning or referring to the Younes, Sodhi and Naik franchisees.

On November 11, 2014, 7-Eleven served its response to the October 16, 2014 Order. The response incorporated by reference its October 13, 2014 interrogatory response and supplemented the answer to interrogatory 5 with some new information regarding Project P. See 7-Eleven's November 11, 2014 "Responses to Discovery Directive Set Forth in the Order of Court Dated October 16, 2014." [Doc. No. 153-1, Exhibit G]. In response to the Court's Order directing 7-Eleven to identify, inter alia, all persons with material knowledge regarding Project P, 7-

Eleven only identified five (5) individuals.[11] Remarkably, 7-Eleven represented that the two versions of the Philly Project Staffing Timeline (P-26 and 33b) that were already produced were the only summary reports regarding the preparation and formation of Project P, the implementation of the project, and the results of the project. As it turned out this representation was false. Further, 7-Eleven ignored the Court's Order to produce all documents specifically mentioning or referring to plaintiffs.

After 7-Eleven's November 11, 2014 response was served plaintiffs suspected that its production was incomplete. Subsequent developments demonstrated that plaintiffs' suspicions were correct. On December 16, 2014, 7-Eleven produced Project P documents that were on Fareed Siddiqui's laptop since June 2012. Siddiqui was a 7-Eleven Zone Leader and took over the running of Project P from Greg Franks in the May-June 2012 time period. Moreover, as discussed in greater detail _infra_, after December 16, 2014, 7-Eleven produced in dribs and drabs plainly relevant documents the Court Ordered to be produced by October 28, 2014. Further, because of plaintiffs' persistence they learned that 7-Eleven did not identify all persons with "material knowledge" regarding Project P.

---

[11] These are Greg Franks, former Penn/Jersey Zone Leader and current V.P. Franchise System, Bill Engen, former Sr. V.P. of Eastern Operations, Eric Jonas, formerly in H.R. Department, Mark Stinde, V.P. of Asset Protection, and Jim Passarella, Director of Asset Protection, East Operations.

Recognizing the deficiencies in 7-Eleven's response to the October 16, 2014 Order, on December 31, 2014 [Doc. No. 165], the Court set another deadline of January 8, 2015 for 7-Eleven to comply with its Order. ("It is further ORDERED that by no later than January 8, 2015, [7-Eleven] shall complete its production of all documents responsive to paragraph 4 of the October 16, 2014 Amended Scheduling Order…. All references to 'Project Philly' shall also include 'Philly Project' and 'Project P'."). The Court held another conference with the parties on January 12, 2015. Still not getting a "straight answer" from 7-Eleven, and hearing from 7-Eleven that it acknowledged its Project P document search was incomplete (see January 12, 2015 Transcript ("Tr.") 18:13 to 19:8), the Court directed plaintiffs to take a Fed. R. Civ. P. 30(b)(6) deposition regarding responsive Project P documents. Id. 22:4-14. In an effort to block the deposition 7-Eleven argued it would be unduly burdensome to prepare a Rule 30(b)(6) witness and it could not "reasonably produce or prepare a responsive witness." See Defense Counsel's January 20, 2015 Letter at 5. [Doc. No. 190]. 7-Eleven's objection were overruled. [Doc. No. 194]. Insofar as the Court knows the Rule 30(b)(6) deposition went off without a hitch despite counsel's "impossibility" defense.

At the January 21, 2015 conference the Court was still not satisfied with 7-Eleven's production. Thus, 7-Eleven was Ordered

to produce all Project P documents and ESI mentioning, referring to, or concerning the franchisee parties. [Doc. No. 195, ¶ 2]. ("To the extent not already done, 7-Eleven shall immediately produce all Project P documents, including ESI, that mention, refer to, or concern" plaintiffs.). Regrettably, the Court stayed enforcement of the Order because of 7-Eleven's protests. Nevertheless, the Court expressed the fact it was "perplexed" as to 7-Eleven's obstinacy since the subject documents were unquestionably relevant to the case. January 28, 2015 Order at 2-3. [Doc. No. 210]. In addition, the same documents were Ordered to be produced on October 16, 2014.[12]

Unfortunately, 7-Eleven's obfuscation continued. Remarkably, 7-Eleven acknowledged at the March 13, 2014 oral argument on another discovery motion that it still had not complied with the October 16, 2014 Order requiring it to produce Project P documents by October 28, 2014, and it was not prepared to say when it would be compliant. Tr. 93:20 to 94; 95:6-9. Having concluded that 7-Eleven would continue to frustrate and

---

[12] The Court also expressed its disagreement with 7-Eleven's absurd argument that the January 28, 2015 Order required it to spend $4 million to "search the emails of all of its multiple thousands of employees." See Jan. 26, 2015 Letter Brief at 1 [Doc. No. 204]. The January 28, 2015 Order pointed out the self-evident requirement that 7-Eleven "need only search for documents where they reasonably might be expected to be located." January 28, 2015 Order at 2-3. This was an easy task since the relevant individuals were identified in 7-Eleven's emails. Id. at 3.

delay discovery without specific directions that should not have been necessary, the Court's March 11, 2015 Order listed the specific Project P documents 7-Eleven had to produce by April 1, 2015. [Doc. No. 258]. Make no mistake about it, however, it should not have been necessary to "spoon-feed" 7-Eleven regarding the relevant and responsive Project P documents to produce. Further, on March 18, 2015, hoping that it would spur 7-Eleven to finally produce all responsive Project P discovery, the Court granted plaintiffs' request and Ordered 7-Eleven to produce the metadata for the few Project P documents produced thus far. [Doc. No. 265]. The Court assumes that after the March 11, 2015 Order 7-Eleven finally produced responsive Project P documents since the parties' Project P disputes largely dissipated.(Either that or a strategy to "wear down" plaintiffs was successful.). Notably, in connection with the present motion plaintiffs served a large notebook of representative Project P documents that 7-Eleven eventually produced.

Plaintiffs' motion asserts various grounds for why sanctions are appropriate. This Opinion will address only the following arguments that have not been resolved by other Orders:

- 7-Eleven has engaged in "stonewalling", "discovery abuses, obfuscation, and flat out misrepresentation" and a "gross failure to provide full and complete discovery."

- 7-Eleven violated the October 16, 2014 Order.

- 7-Eleven produced responsive documents late.

- 7-Eleven exhibited a general lack of good faith to respond to discovery and disclose.

Due to 7-Eleven's alleged vexatious conduct, plaintiffs ask for sanctions pursuant to the Court's inherent power and 28 U.S.C. §1927. Plaintiffs also seek sanctions pursuant to Fed. R. Civ. P. 37(b)(2) because of 7-Eleven's failure to comply with the Court's October 16, 2014 Order. Plaintiffs ask the Court to strike 7-Eleven's answer and request monetary sanctions. In opposition 7-Eleven generally argues it did not violate the October 16, 2014 Order. 7-Eleven insists that it made an "extensive, expeditious and good faith effort to comply" with the Order. Brief in Opposition ("Opp.") at 3 [Doc. No. 227]. It also argues that if it was non-compliant its conduct was "innocent and inadvertent" and the result of "honest confusion" regarding what plaintiffs wanted. Id. at 1-3.

Discussion

The Court's sanctions analysis is divided into two time periods. The Court will first address whether sanctions should be imposed because of 7-Eleven's actions that occurred before the entry of the October 16, 2014 Order. In this regard the Court will focus on plaintiffs' interrogatories 4 and 5 served in November 2013 which asked about 7-Eleven's franchise termination efforts. The Court will next address 7-Eleven's

response to the October 16, 2014 Order. After these two time periods are addressed, the Court will then decide what sanctions are appropriate.

In summary, the Court rules that 7-Eleven's pre-October 16, 2014 conduct violated Fed. R. Civ. P. 26(g) because its January 2014 answers to interrogatories 4 and 5 were not complete and correct, and because it did not do an objectively reasonable investigation to respond to the interrogatories. The Court also finds that 7-Eleven violated the Court's October 16, 2014 Order without substantial justification, and that no circumstances exist to make an award of expenses unjust.

1.   <u>Should Sanctions be Awarded?</u>

A. <u>Pre-October 16, 2014 Conduct</u>

As already noted, the October 16, 2014 Order was the first time the Court specifically Ordered 7-Eleven to produce Project P discovery. 7-Eleven argues there is no source for sanctions for any of its conduct that occurred before the Order was entered, and that sanctions are only available if it violated the Order.[13]   7-Eleven is wrong. A party cannot serve

---

[13]   "[I]t is the efforts of 7-Eleven and its counsel to comply with the Court's October 14, 2014 oral and written Orders in the several months since they were entered that is the appropriate focus of inquiry." Brief in Opp. at 2; <u>see also</u> <u>id.</u> at 17-18. ("The threshold step necessary to justify the imposition of sanctions" is the issuance of the October 16, 2014 Order); <u>id.</u> at 45 (sanctions may not be awarded because 7-Eleven did not violate a Court Order).

substantially deficient discovery responses with impunity. There are at least three sources to impose sanctions arising out of 7-Eleven's pre-October 16, 2014 conduct: (1) 28 U.S.C. §1927, (2) the Court's inherent power, and (3) Rule 26(g)(3). Each of these will be discussed.

(1)   §1927 and Inherent Power Sanctions

Section 1927 of Title 28 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In order to impose sanctions pursuant to §1927 there must be a finding that an attorney (1) multiplied proceedings, (2) in an unreasonable and vexatious manner, (3) increasing the cost of the proceedings, and (4) that it did so in bad faith or by intentional misconduct. In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 101 (3d Cir. 2008). "[S]anctions may not be imposed under §1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment or well-intentioned zeal." Grider v. Keystone Health Plan Cent., Inc., 580 F.3d 119, 142 (3d Cir. 2009)(quotation and citation omitted). Bad faith or intentional misconduct must be shown by clear and convincing evidence. Pop Test Cortisol, LLC v. The

_University of Chicago_, C.A. No. 14-7174 (WJM), 2015 WL 5089519, at *9 (D.N.J. 2015).

Similarly, the Court has the inherent power to sanction a litigant for bad faith conduct. _Chambers v. Nasco, Inc._, 501 U.S. 32, 35 (1991). In practice, the only meaningful difference between an award under §1927 and one under the Court's inherent power is that awards under §1927 may only be against attorneys or other persons authorized to practice before the court, while an award under the Court's inherent power may be made against an attorney, a party, or both. _Enmon v. Prospect Capital Corp._, 675 F.3d 138, 143-44 (2d Cir. 2012).

Given the high burden to impose sanctions under §1927 and the Court's inherent power, the Court declines to impose sanctions under these authorities. While the Court will explain in detail 7-Eleven's transgressions and missteps, the evidence does not support a finding by clear and convincing evidence that 7-Eleven acted in bad faith or with intentional misconduct.

(2)  Rule 26(g)

(a)  Did 7-Eleven Violate Rule 26(g)?

Another source of sanctions for 7-Eleven's pre-October 16, 2014 actions is Rule 26(g).[14] Rule 26(g) provides in relevant part:

---

[14]Although plaintiffs did not seek sanctions under Rule 26(g)(3), the Rule specifically authorizes the Court to raise the issue

(1) Signature Required; Effect of Signature. Every disclosure under Rule 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name …. By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

(A) with respect to a disclosure, it is complete and correct as of the time it is made; and

(B) with respect to a discovery request, response, or objection, it is:

(i) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law;

(ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and

(iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action.

. . .

(3) Sanction for Improper Certification. If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation.

Rule 26(g) requires all attorneys to engage in pretrial

discovery in a responsible manner consistent with the spirit and

---

sua sponte. ("If a certification violates this rule without substantial justification, the Court, on motion or on its own, must impose an appropriate sanction[.]").

purposes of liberal discovery. Kosher Sports, Inc. v. Queens Ballpark Co., LLC, No. 10-cv-2618 (JBW), 2011 WL 3471508, at *7 (E.D.N.Y. Aug. 5, 2011)(quoting Fed. R. Civ. P. 26(g) Advisory Committee Note to 1983 Amendment)(hereinafter "1983 Note"). Pursuant to the Rule an attorney's signature certifies that any disclosures were complete and accurate at the time they were made and that a reasonable inquiry was made. Singer v. Covista, Inc., C.A. No. 10-6147 (JLL), 2013 WL 1314593, at *9 (D.N.J. March 28, 2013). An objective standard is used to determine if a certification is reasonable. St. Paul Reinsurance Company, Ltd. v. Commercial Financial Corp., 198 F.R.D. 508, 516 (N.D. Iowa 2000)("The standard for imposing Rule 26(g) sanctions is objective."). Unless the offending conduct is harmless, a violation of Rule 26(g) without substantial justification must result in the imposition of sanctions. Chambers, 501 U.S. at 51. Substantial justification exists where there is a genuine dispute or if reasonable people could differ. Heller v. City of Dallas, 303 F.R.D. 466, 477 (N.D. Tx. 2014).

As to what Rule 26(g) sanction to impose, this is left to the Court's discretion. The Rule merely provides that the sanction be "appropriate." Chambers, 501 U.S. at 51. Nevertheless, Rule 26(g) is cast in mandatory terms. Id. Sanctions are encouraged in order to curb discovery abuses. Singer, at *9. The sanction may be imposed against the

certifying attorney, the client, or both. Markey v. Lapolla Industries, Inc., No. CV 12-4622 (JS)(AKT), 2015 WL 5027522, at *18 (E.D.N.Y. Aug. 25, 2015).

Rule 26(g) unquestionably applies to 7-Eleven's responses to interrogatories and document requests. "The term 'response' [in Rule 26(g)(1)] includes answers to interrogatories and to requests to admit as well as responses to production requests." See 1983 Note; see also 1993 Note ("[T]hese rules establish sanctions for violation of the rules regarding disclosures and discovery matters."). In addition, Rule 26(g) by its terms applies to objections to discovery.

The Court's Rule 26(g) discussion focuses on 7-Eleven's January 15, 2014 responses to interrogatories 4 and 5. Although the interrogatories did not specifically refer to Project P, the inquiries were plainly directed to finding out about 7-Eleven's franchise termination efforts. Interrogatory 4 asks about efforts or intentions to terminate plaintiffs' franchises and documents regarding this topic. 7-Eleven's response states that it made no effort and had no intention to terminate plaintiffs' franchises other than what is included in the Notices of Material Breach that it produced. To the contrary, however, plaintiffs have unveiled a number of documents contradicting this representation. 7-Eleven's documents evidence that plaintiffs' stores appeared on a list(s) of "targeted

24

franchisees," plaintiffs' stores were on a list(s) where replacement staff would be needed, and plaintiffs' stores appeared on a list(s) of second wave locations. See, e.g., Plaintiffs' Deposition Exhibits P-19, 20, 22, 25, 26, 33b, 41 and 118. 7-Eleven's failure to identify this information and other similar documents resulted in an inaccurate and incomplete response.[15] Even if 7-Eleven is correct that it did not formally move to terminate plaintiffs' franchises, interrogatory 4 is not so limited. The interrogatory is broader and asks about 7-Eleven's plans, communications and intentions. 7-Eleven's response was misleading as evidenced by the cited deposition exhibits.[16]

7-Eleven's response to interrogatory 5 is even more troublesome. Interrogatory 5 asks about a core issue in the case--South Jersey franchise terminations. 7-Eleven's objections to the interrogatory are meritless and are stricken. 7-Eleven set forth boilerplate objections that the interrogatory was

---

[15] Plaintiffs argue that it was not until April 13, 2015 and May 1, 2015 that 7-Eleven produced documents indicating that plaintiffs' locations appeared on a 7-Eleven "targeted" list. Supp. Brief at 11-12. [Doc. No. 330]. According to plaintiffs, "[t]hese documents reveal that take back efforts involving Plaintiffs' location[s] began even before the term Philly Project or Project P was coined[.]" Id. at 12.

[16] The Court understands, but does not excuse, why the answer to interrogatory 4 was inaccurate and incomplete. At the time of the answer 7-Eleven had not done a reasonable investigation to uncover the responsive Project P documents it produced months later. 7-Eleven has not supplemented its response to interrogatory 4.

overly broad, unduly burdensome, irrelevant and confidential. It is well-settled this is inappropriate and results in the waiver of the objection. NE Technologies, Inc. v. Evolving Systems, Inc., C.A. No. 06-6061 (MLC), 2008 WL 4277668, at *5 (D.N.J. Sept. 12, 2008)("When objecting to a discovery request, an objecting party must state with specificity the grounds for the objection, and not the familiar litany that an interrogatory or document production request is overly broad, burdensome, oppressive and irrelevant.")(citation and quotation omitted). As noted in Harding v. Dana Transport, Inc., 914 F. Supp. 1084, 1102 (D.N.J. 1996), "[b]road-based, non-specific objections are almost impossible to assess on their merits, and fall woefully short of the burden that must be borne by a party making an objection to an interrogatory or document request"; see also Weems v. Hodnett, C.A. No. 10-cv-1452, 2011 WL 3100554, at **1-2 (D. La. July 25, 2011) ("General objections such as the ones asserted … are meaningless and constitute a waste of time for opposing counsel and the court…. Plaintiff's general objections violate the letter and spirit of Rule 26(g))"; St. Paul Reinsurance Co., Ltd., 198 F.R.D. at 517 (finding Rule 26(g) violation because of plaintiff's obstructionist and frivolous objections to document requests).

Not only were 7-Eleven's objections meritless, but its relevancy objection was frivolous since a main focus of

plaintiffs' case is whether 7-Eleven had a plan or scheme to terminate South Jersey franchises. Although 7-Eleven believes Project P is immaterial, there is no legitimate question that plaintiffs are entitled to pursue discovery to support their theory of the case, especially in light of the allegations in their complaint. Project P is clearly a relevant subject of discovery. See Rule 26(b)(1)("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party[.]").

Interrogatory 5 asked a simple and direct question: whether there were any plans or communications to terminate 7-Eleven franchise agreements in South Jersey. As demonstrated by 7-Eleven's later productions, the answer to this question is indisputably yes. However, rather than appropriately answering interrogatory 5, 7-Eleven responded by asserting boilerplate objections with non-responsive information.[17] 7-Eleven's evasive, misleading and incomplete response is treated as a failure to disclose, answer or respond. See Rule 37(a)(4). ("[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond.").

---

[17] After its objections 7-Eleven answered interrogatory 5 as follows: "Defendant responds that its policies regarding the termination of franchises are set forth in the Franchise Agreements…." Id. This information was non-responsive. Since 7-Eleven chose to respond to the interrogatory after asserting its objections, it should have responded with accurate information that answered the question that was asked.

7-Eleven's answers to interrogatories 4 and 5 were inconsistent with applicable case law and the letter and spirit of the federal rules. A party responding to interrogatories cannot meet its obligations by sticking its head in the sand and refusing to look for answers. <u>Health Grades, Inc. v. MDX Medical, Inc.</u>, C.A. No. 11-cv-00520-RM-BNB, 2014 WL 30001, at *3 (D. Colo. Jan. 3, 2014)(citation and quotation omitted). This is what 7-Eleven did when it failed to identify Project P in its January 2014 interrogatory answers or in a timely supplement. Interrogatories must be answered directly and without evasion based on information the party possesses after due inquiry. <u>Id.</u> 7-Eleven's bare bones answers suggest that little or no research or investigation was done. This point is demonstrably illustrated by the fact that when the January 15, 2014 answers were served 7-Eleven did not consult with any of the individuals who had material knowledge regarding Project P.[18]

If 7-Eleven conducted a reasonable investigation it would have unquestionably learned about Project P and should have included responsive information in its January 2014 answers. This is plainly evidenced by the fact that 7-Eleven started to

---

[18] Compare 7-Eleven's responses to interrogatories 1 and 2 listing Pauline Keefe, Rich Mikalkovitz, Wade Newman, Nancy Tabeek and Mike Bertha as people consulted for its January 15, 2014 answers, to its November 11, 2014 response listing Greg Franks, Bill Engen, Eric Jonas, Mark Stinde and James Passarella as key individuals who established and oversaw Project P.

produce Project P discovery, albeit in dribs and drabs, in September, 2014. The Project P discovery 7-Eleven produced in late 2014 and 2015 should have been produced in early 2014 if a reasonable investigation was done. As has been explained, although 7-Eleven's conduct was deficient, the Court is reluctant to conclude that it intentionally and deliberately withheld relevant and responsive discovery. Therefore, the only logical conclusion left to draw is that 7-Eleven did not do a reasonable investigation for responsive information when it served its January 2014 responses.[19]

If 7-Eleven complied with the certification requirement in Rule 26(b) and appropriately investigated and answered interrogatories 4 and 5, Project P would have been identified early in the case. The signatures to 7-Eleven's interrogatory answers certified that after a reasonable inquiry 7-Eleven's answers were complete and correct, and its objections were warranted by existing law. 7-Eleven's Certification violated Rule 26(g) because, inter alia, it did not identify Project P for eight (8) months, it did not produce or identify responsive

---

[19] One glaring deficiency is that it was not until long after January 15, 2014 that 7-Eleven finally checked the computers of Gregory Franks and Fareed Siddiqui for responsive ESI. These witnesses ran Project P. It is hard to comprehend why early in the case 7-Eleven did not search the ESI of two of its most important witnesses. Indeed, 7-Eleven did not even find out about the important Project P documents on Siddiqui's laptop computer until his deposition on July 22, 2014.

documents, and it set forth meritless objections, at least one of which was frivolous.

The Court cannot underestimate the amount of time and resources that were wasted because 7-Eleven did not do what it was supposed to do. One might ask how could the failure to properly answer two interrogatories cause so many problems. This case is a "poster child" for the havoc that could result. If Project P was identified before the avalanche of discovery disputes starting in the summer/fall of 2014, discovery would have likely proceeded in an organized and orderly fashion. Instead, discovery was unnecessarily contentious, extended and expensive. The Court has no doubt that if 7-Eleven appropriately responded to interrogatories 4 and 5 months of discovery wrangling would have been avoided and tens and probably hundreds of thousands of dollars in transaction costs would have been saved. Further, but for plaintiffs' persistence they would have been at a substantial disadvantage at trial.

There is no getting around the fact that if 7-Eleven had done an objectively reasonable investigation in January 2014 it would have and should have identified Project P. Any other conclusion is implausible. After all, the project consumed enormous 7-Eleven time and money and generated substantial reports and emails. Indeed, 7-Eleven designated Project P as a "priority strategic project." Even 7-Eleven's counsel described

the company's efforts as "massive." January 12, 2014 Tr. 24:25 ("[This] was a massive project[.]"). Further, 7-Eleven's personnel with responsibility for plaintiffs' stores were intimately involved with Project P. Key witnesses in the case also had important Project P roles. And to top it off, 7-Eleven's counsel who signed the January 15, 2014 answers played a prominent role in the formation and implementation of Project P. Counsel's important role is clearly evidenced by the fact that there were 950,000 references to Project P in his historical emails. Id. 25:23 to 26:4.[20]

7-Eleven's disingenuousness is not lost on the Court. On the one hand 7-Eleven argued that outside counsel's Project P documents should not be produced because they were prepared in anticipation of litigation. On the other hand 7-Eleven did not disclose responsive Project P discovery in interrogatory answers the same counsel signed. 7-Eleven's early feigned lack of knowledge about Project P and related documents is also inconsistent with its argument that it did not have to produce all Project P documents because they were too voluminous. ("We probably have hundreds of thousands and, in fact, millions of documents[.]" Id. 24:19-20). Simply stated, it is implausible to

---

[20] The Court is not sure if this number is a typographical error. The Court assumes not because 7-Eleven never corrected the transcript.

argue that 7-Eleven's failure to identify Project P in its January 2014 answers is excusable or justified.

Rule 26(g) does not require perfection and does not impose an unreasonably high burden on litigants. It simply requires that a reasonable inquiry be made into the factual basis of a discovery response and that responses to discovery be complete and correct when made. Litigants must act responsibly and avoid abuse. Parties must "stop and think" about the legitimacy of a discovery response. As noted in <u>Bratka v. Anheuser-Busch Co., Inc.</u>, 164 F.R.D. 448, 463 (S.D. Ohio 1995):

> If litigants are to have any faith in the discovery process, they must know that parties cannot fail to produce highly relevant [discovery] within their possession with impunity. Parties cannot be permitted to jeopardize the integrity of the discovery process by engaging in halfhearted and ineffective efforts to identify and produce relevant [discovery].

<u>See also</u> 1983 Note ("If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse.").

While an attorney need not supervise every aspect of a client's document production, the attorney is responsible for coordinating the client's discovery efforts so that responsive documents are located and produced. <u>Id.</u> at 20. An attorney makes a "reasonable inquiry" under Rule 26(g) if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. Ultimately, what is

reasonable is a matter for the Court to decide on the totality of the circumstances. Markey v. Lapolla Industries, Inc., No. CV 12-4622 (JS)(AKT), 2015 WL 5027522, at *15 (E.D.N.Y. Aug. 25, 2015)(citation and quotation omitted). An objective standard is applied in determining whether sanctions are to be applied under Rule 26(g). Grider v. Keystone Health Plan Central, Inc., 580 F.3d 119, 140 n.23 (3d Cir. 2009)(citation and quotation omitted).

7-Eleven's signature to its January 15, 2014 interrogatory answers is a certification of the elements set forth in Rule 26(g). See 1983 Note. 7-Eleven must be held accountable for its deficient certification. Rule 26(g) should not be treated like the proverbial stepchild. Lawyers should not be able to serve boilerplate, meritless and frivolous objections with impunity. Lawyers should not have to wait until after meet and confer sessions and/or discovery applications or motions to obtain plainly relevant information. Lawyers should not act like "potted plants" and accept implausible representations from clients that no responsive documents or discovery exists. These actions have to stop.

Even if the Court accepts 7-Eleven's argument that its January 2014 response was appropriate, which it is not, 7-Eleven's October 13, 2014 supplement to interrogatory 5 should have been served long before plaintiffs had to file a multitude

of discovery applications. <u>See</u> Rule 26(e)(a party must supplement an interrogatory answer in a timely manner if in a material respect the response is incomplete or incorrect). Plaintiffs referred to "Operation Philadelphia" as 7-Eleven's termination effort. 7-Eleven repeatedly denied knowledge of Operation Philadelphia and claims it did not know what plaintiffs wanted. If 7-Eleven had done a reasonable investigation it would have and should have realized that plaintiffs were asking about Project P. A party answering interrogatories is under a duty to produce all information available to the party. <u>Myhre v. Seventh Day Adventist Church</u>, 298 F.R.D. 633, 647 (S.D. Ca. 2014). A party is charged with knowledge of what its agents know and what is in the documents available to it. <u>Desert Valley Painting & Drywall, Inc. v. United States</u>, No.2:10-cv-00490-KJD-GWF, 2012 WL 4792913, at *6 (D. Nev. Oct 9, 2012). 7-Eleven knew plaintiffs were asking about franchise terminations in South Jersey. If a reasonable investigation was done 7-Eleven would have learned plaintiffs were named in numerous Project P related documents. 7-Eleven should have identified Project P after plaintiffs inquired about Operation Philadelphia.

In sum, 7-Eleven violated Rule 26(g) for at least two reasons. One, it did not perform an objectively reasonable investigation to answer interrogatories 4 and 5 which resulted

in incomplete and incorrect answers. Two, its objections to interrogatory 5 were meritless, and its relevancy objection was frivolous.[21]

### (b) Was 7-Eleven's Conduct Substantially Justified?

As noted, Rule 26(g) sanctions are mandatory unless the offending party's conduct was substantially justified. Substantial justification exists where reasonable people could differ. Markey, 2015 WL 5027522, at *18. The test of substantial justification is satisfied if there is a genuine dispute concerning compliance. Grider, 580 F.3d 140 n.23. None of 7-Eleven's substantial justification arguments hold water.

7-Eleven argues its actions were justified because it allegedly made extensive, expeditious and good faith efforts to furnish responsive discovery. Even if true, the Court can impose sanctions without finding that 7-Eleven acted with subjective bad faith or purposely. Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 242 (3d Cir. 2007) (if the impact is severe on the party who was due discovery, sanctions may be appropriate even if the failure to produce is inadvertent). This makes perfect sense because otherwise plaintiffs would have to pay the price for 7-Eleven's oversights.[22] 7-Eleven also argues that its

---

[21] To be clear, the Court would still grant sanctions even it 7-Eleven properly answered interrogatory 4.

[22] In order to defend its conduct 7-Eleven has at times cited to the substantial transaction costs it incurred to respond to

"honest confusion" about what plaintiffs wanted caused some of its oversights. If in fact 7-Eleven was confused, 7-Eleven has itself to blame. The Court is at a loss to understand how and why 7-Eleven was confused in view of the substantial number of conferences and rulings addressing Project P issues, plaintiffs' representations on the record, and the parties' August 20, 2014 meet and confer. Further, plaintiffs acknowledged that as of July 25, 2014, they understood what plaintiffs meant by Project P. February 23, 2015 Decl. of S. Wiggins Decl. ¶ 25. [Doc. No. 227-1].

7-Eleven also argues its actions were justified because plaintiffs did not specifically ask for Project P discovery. In fact, 7-Eleven makes the incredulous argument that plaintiffs are to blame because they did not originally ask for Operation Philadelphia documents or "anything similar" in document requests, ESI search terms and Rule 30(b)(6) topics of inquiry. Brief in Opp. at 2. This argument is meritless. Plaintiffs did not have to specifically identify Project P in its interrogatories or in "meet and confer" sessions for 7-Eleven to

---

discovery. While the Court does not doubt 7-Eleven spent a lot of money, the Court has no sympathy for its protests. 7-Eleven only has itself to blame for its incomplete, duplicative and/or misguided document and ESI searches. If 7-Eleven had done what it was supposed to do from the outset of discovery its transaction costs would have been substantially reduced.

identify the project.[23] This Court wrote in <u>Inferrera v. Wal-Mart Stores, Inc.</u>, C.A. No. 11-5675 (RMB/JS), 2011 WL 6372340, at *2 (D.N.J. Dec. 20, 2011), that discovery is not a "gotcha" game. The purpose of the court system is to resolve civil disputes in a civil way. <u>Montana v. County of Cape May Board of Freeholders</u>, C.A. No. 09-755 (NLH/JS), 2013 U.S. Dist. LEXIS 189464, at **27-28 (D.N.J. Sept. 20, 2013). 7-Eleven is playing a "gotcha" game when it argues it did not have to produce Project P discovery because plaintiffs referred to Operation Philadelphia instead of Project P. In this context these terms are synonymous. It was not plaintiffs' burden to specifically identify the term Project P before they received responsive information. They are franchisees with no knowledge of 7-Eleven's internal plans. If a reasonable investigation was done the use of the term "Operation Philadelphia", in the context of plaintiffs' representations and theory of the case, and 7-Eleven's hoard of Project P documents, would have and should have put 7-Eleven on notice that plaintiffs were referring to Project P.

This situation is analogous to what occurred in <u>Montana</u>. In that case the plaintiff, Arthur Montana, requested emails that

---

[23] The Court is aware that plaintiffs' counsel repeatedly represents that it brought these terms to 7-Eleven's attention at their August 20, 2014 "meet and confer." 7-Eleven has not contested this assertion.

mentioned his name and included the term "Arthur Montana" in his ESI search terms. After the Cape May defendants produced relevant documents late, Montana moved for sanctions. Cape May justified its late production by arguing that Montana did not use correct search terms. In turned out that Cape May's search only identified documents with the term "Arthur Montana" and not "Art Montana." Needless to say, Cape May's feeble excuse was rejected. Montana, at **29-31. 7-Eleven's excuse that it did not have to produce Project P documents because plaintiffs used the term Operation Philadelphia is just as feeble as Cape May's excuse in Montana that it did not have to produce "Art Montana" documents because plaintiff only asked to search for "Arthur Montana".

There was no mistake about the fact that plaintiffs sought discovery about 7-Eleven's efforts to terminate South Jersey franchises. It is not reasonable or justifiable given plaintiffs' complaint (see ¶¶17-23), the Joint Discovery Plan, plaintiffs' theory of the case, and plaintiffs' discovery requests that 7-Eleven did not know until July, August or September 2014 that when plaintiffs referred to Operation Philadelphia they were actually referring to Project P. Given that in the Rule 26(g) context the Court uses an objective not subjective standard, 7-Eleven's protests to the contrary ring hollow. The point is demonstrably brought home when one

considers that the parties acknowledged in their July 2013 Joint Proposed Discovery Plan that discovery would be directed to whether there were plans to terminate plaintiffs' franchises inconsistent with their franchise agreements, and plaintiffs indicated they would take discovery on efforts to terminate South Jersey franchises. This was a signal to 7-Eleven that Project P discovery would be center stage in the case.

Further, the federal rules do not and should not require plaintiffs to use "magic words" to obtain clearly relevant discovery. Montana, at *29. The "obligation on parties and counsel to come forward with relevant documents requested during discovery is 'absolute'." Tracinda Corp., 502 F. 3d at 243. As noted in 8B Wright, Miller & Marcus, Federal Practice and Procedure §2177 at 82 (2010 ed.)(quoting 1993 Note):

> Interrogatories and production requests should not be read or interpreted in an artificially restrictive or hypertechnical manner to avoid disclosure of information fairly covered by the discovery request, and to do so is subject to appropriate sanctions under subdivision (a) [of Rule 37].

7-Eleven had an independent duty to produce relevant and responsive discovery even if plaintiffs did not specifically list Project P in their list of ESI search terms. 7-Eleven may not delegate to plaintiff the duty to identify its relevant requested discovery. As noted in Poole ex rel. Elliott v. Textron, Inc., 192 F.R.D. 494, 507 (D. Md. 2000), "[t]he rules

39

of discovery must necessarily be largely self-enforcing. The integrity of the discovery process rests on the faithfulness of parties and counsel to the rules--both the spirit and the letter." Moreover, "the discovery provisions of the Federal Rules are meant to function without the need for constant judicial intervention, and ... [the] Rules rely on the honesty and good faith of counsel in dealing with adversaries." <u>Id.</u> (quoting <u>Hopei Garments (Hong Kong), Ltd. v. Oslo Trading Co., Inc.</u>, No. 87 CIV. 0932 (MBM), 1988 WL 25139 (S.D.N.Y. March 8, 1988)).

7-Eleven also argues its actions were justified because plaintiffs purposely misled it as to what they wanted. March 13, 2015 Tr. 53-13 to 60:1.[24] This argument is absurd. Plaintiffs had no incentive to mislead 7-Eleven as what they requested. The notion that plaintiffs wanted to waste substantial time and money seeking relevant discovery is, to put it mildly, ridiculous.

To the extent 7-Eleven relies upon the faulty recollection of a client representative to justify its actions, the argument

---

[24] Not believing what it heard, 7-Eleven's counsel was asked point blank if he was contending that when plaintiffs asked for documents regarding Operation Philadelphia they knew 7-Eleven referred to the project as Project P and Project Philly. Counsel's response was "my contention is 100 percent absolutely positively yes." <u>Id.</u> 57:9-10. The Court repeated the same question and was met with the same response: "well it may have been astounding when you heard it the first time and I'm repeating that." <u>Id.</u> 58:18-19.

is also rejected. A lawyer must make a "reasonable effort to assure that the client has provided all the information and documents available to [the lawyer] that are responsive to the discovery request." See 1983 Note. This most assuredly was not done since 7-Eleven's lead defense lawyers and key personnel were intimately involved with Project P.

Even after 7-Eleven acknowledged it understood what plaintiffs intended by Operation Philadelphia its foot-dragging continued. First, it delayed supplementing its interrogatory answers. Rule 26(e) imposes a duty to supplement responses to discovery requests throughout the litigation. Bowers v. Nat'l Collegiate Athletic Ass'n., 475 F.3d 524, 538 (3d Cir. 2007), amended on reh'g (March 7, 2007). Second, 7-Eleven's supplement was incomplete and misleading. On October 10, 2014, 7-Eleven wrote that employees in its Human Resources Department "at times, used the term 'Project P' or 'Philly Project'." See Letter of Counsel at 2 [Doc. No. 130]. 7-Eleven also wrote that its production of two spreadsheets and its October 13, 2014 supplemental interrogatory response "should resolve this [Project P] lingering dispute." Id. 7-Eleven's effort to minimize the importance and scope of Project P was demonstrably misleading. Interrogatories must be answered directly and without evasion. 8B Wright, Miller & Marcus, supra §2177 at 80.

7-Eleven's minimization efforts are remarkable given the fact that Project P was projected to be a mammoth effort.

As a result of plaintiffs' persistent efforts 7-Eleven's hope to put Project P discovery behind it was not successful. After October 2014, 7-Eleven finally started to produce responsive Project P discovery. This evidences that before October 16, 2014, 7-Eleven was either deliberately withholding relevant Project P discovery or it still had not done a reasonable investigation to discover readily available responsive information. The Court prefers to give 7-Eleven the benefit of the doubt and concludes that its conduct was deficient rather than deliberate. Nevertheless, in this context it is unfathomable that even as late as October 2014 7-Eleven did not acknowledge the scope and importance of Project P in the context of the case. It was only because of plaintiffs' persistent and dogged discovery efforts that 7-Eleven finally came around to producing responsive information.

In sum, the Court finds that 7-Eleven violated Rule 26(g) and that sanctions must be imposed because 7-Eleven's conduct was not substantially justified. 7-Eleven signed interrogatory answers containing meritless and frivolous objections. Using an objective standard 7-Eleven's January 15, 2014 responses to interrogatories 4 and 5 were incomplete and inaccurate. 7-Eleven knew or should have known when it signed its answers that

Project P was responsive and should have been identified. Furthermore, 7-Eleven did not timely supplement its responses to interrogatories 4 and 5, and its supplement was incomplete and misleading. The Court will discuss infra the appropriate sanction for 7-Eleven's Rule 26(g) violation.

To be sure, the Court is not ruling that every meritless or boilerplate objection or that every incomplete or inaccurate interrogatory answer should result in a Rule 26(g) sanction. However, this is not all that occurred here. 7-Eleven failed to provide clearly responsive information that should have been disclosed if a reasonable investigation was done. The information at issue was always readily available. Further, the substantive information 7-Eleven disclosed was misleading. And, it took 7-Eleven months to finally identify Project P information that should have been disclosed in January 2014. In addition, 7-Eleven's transgressions created havoc with regard to case management and caused plaintiffs to incur substantial unnecessary transaction costs. It is the "totality of the circumstances" that justifies sanctions, not one specific transgression.

B.   Post-October 16, 2014 Conduct

In addition to finding that 7-Eleven violated Rule 26(g), the Court also finds that it violated Rule 37(b)(2). As will be discussed, 7-Eleven did not comply with the Court's October 16,

2014 Order directing that key Project P information and documents be produced by October 28, 2014. The Order provided:

> By **October 28, 2014**, 7-Eleven shall produce the "Project Philly" information and documents Ordered to be produced at the October 14, 2014 conference. This includes the identities and positions of: the persons who established the project, the employees who ran the project, and all persons with material knowledge regarding the project, and in particular, the <u>Younes</u>, <u>Sodhi</u>, and <u>Naik</u> franchisees. 7-Eleven shall produce all summary reports regarding Project Philly that address or concern the formation and preparation of the project, the implementation of the project, and the results of the project, and all documents specifically mentioning or referring to the <u>Younes</u>, <u>Sodhi</u> and <u>Naik</u> franchisees.

7-Eleven's first problem is that instead of responding to the Court's Order it decided for itself what to answer. This is how 7-Eleven began its November 11, 2014 response to the October 16, 2014 Order:

> Per its Order dated October 14, 2014, the Court instructed 7-Eleven, Inc. to:
>
> 1.   Identify the key individuals who established Project Philly, who ran Project Philly, who was in charge of Project Philly and responsible persons with knowledge regarding the project; and
>
> 2.   Produce existing summary reports regarding Project Philly that address the preparation and formation of the project, the implementation of the project, and the result of the Project.

[Doc. No. 153, Exhibit G]. As is evident, the Court Ordered 7-Eleven to identify "all persons with material knowledge regarding [Project P]" and not just, in 7-Eleven's words, "responsible persons with knowledge regarding the project." The

Court also Ordered 7-Eleven to produce "all summary reports regarding Project Philly that address or concern . . . and all documents specifically mentioning or referring to the Younes, Sodhi, and Naik franchisees." Remarkably, 7-Eleven omitted referencing the requirement that it produce documents mentioning or referring to the plaintiffs. The Court has no explanation for why 7-Eleven unilaterally decided to re-draft the October 16, 2014 Order for its benefit.

Further, 7-Eleven's November 11, 2014 response to the Court's Order was woefully incomplete and non-responsive. First, 7-Eleven did not identify "all persons with material knowledge "regarding Project P." Plaintiffs' discovery revealed that numerous other persons not identified in 7-Eleven's response should have been listed. It is unquestionably the case that more than five (5) people had material knowledge regarding Project P.[25] Second, contrary to the Court's Order, 7-Eleven did not

---

[25] These individuals include: Amber Hannush, Janice Tangradi, Eric Jonas, Jennifer Ash, Brad Jenkins, Rankin Gassaway, all members of the "Philly Project Team," all participants in regular Project P conference calls and meetings, all Steering Committee members, all Core Team members, and possibly others. The Court determined these individuals had material knowledge regarding Project P from the context of the Project P documents included with plaintiffs' motion, their membership on important committees, and their participation in important discussions. The Court cannot state for certain what each of these individuals knows about Project P but it is evident from 7-Eleven's emails that at one time they had material knowledge regarding Project P. The Court will not accept 7-Eleven's excuse that it did not identify the foregoing individuals because the

identify who established Project P and the employees who ran the Project. Third, 7-Eleven remarkably represented that only two summary reports existed regarding Project P.[26] Again, plaintiffs' efforts documented that this representation was false. For example, it was only after plaintiffs persisted that 7-Eleven finally produced responsive Project P summaries titled Strategic Projects Resource Allocation (P-18), Philly Project August 12, 2011 (P-20), Strategic Project Summary Project P (P-37), Project P Core Team Kickoff (P-38), Project Philly Contingency Plan (P-39), Project Philly-4 Step (P-41), Project P Status Update (P-42), and Philly Take-Back Financial Summary with Impacts (P-73).[27]

    7-Eleven's failure to comply with the October 16, 2014 Order is also evidenced by its inadequate search for responsive ESI. On December 18, 2014, plaintiffs asked 7-Eleven to search

Court indicated that only "key" individuals had to be identified. This is not what the October 16, 2014 Order requires. Also, the listed individuals had "key" knowledge.
[26] The Court does not accept 7-Eleven's excuse that it only produced two documents because it thought Project P was just a staffing initiative. This understanding is preposterous in view of the extensive documents and emails referencing the termination of franchises. The understanding is also incredulous in view of the fact that defense counsel claimed their documents were privileged because the documents were prepared in connection with anticipated litigation to terminate franchises. 7-Eleven's excuses do not line up.
[27] Given these and other Project P documents 7-Eleven eventually produced, one wonders why 7-Eleven misled plaintiffs by stating that 7-Eleven's "staffing initiative was loosely and colloquially referred to as 'Philly Project.'" See November 11, 2104 Response to November 16, 2014 Order (emphasis added).

the ESI of eighteen (18) key individuals "for all emails and documents relating to Project Philly/Project P and/or any other strategic project seeking to take back stores." See Plaintiffs' December 18, 2014 letter [Doc. No. 163-16]. 7-Eleven should have done this search before it responded to the October 16, 2014 Order. It should not have been necessary for plaintiffs to prod 7-Eleven to search for responsive ESI in obvious locations. Moreover, it is inexplicable that plaintiffs' list of ESI custodians to search included three of the five key individuals 7-Eleven identified on November 11, 2014 (Passarella, Franks and Stinde). 7-Eleven's failure to search or even collect the ESI of these obvious custodians before December 2014 evidences its deficient response to the October 16, 2014 Order. Moreover, as late as March 10, 2015, 7-Eleven had not completed its review of the computers of these key custodians even though this should have been done at least a year earlier. March 13, 2015 Tr. 69:5-22. 7-Eleven's inadequate response is also evidenced by the fact that as late as March 13, 2015, it acknowledged it had not fully complied with the October 16, 2014 Order and it could not commit to a date certain when the production would be finished. March 13, 2015 Tr. 93:20 to 94:1.[28] This is remarkable given the fact

---

[28] Counsel was asked when will 7-Eleven be able to represent to the Court that they are satisfied they fully responded to the October 16, 2014 Order. The response was "I can't tell you that today" and "I'm just not in a positon today to give the Court

the Court first Ordered 7-Eleven to produce Project P discovery by October 28, 2014, and then because of its non-responsiveness by January 8, 2015. <u>See</u> October 16, 2014 and December 31, 2014 Orders.

These are other glaring examples demonstrating 7-Eleven's deficient response to the October 16, 2014 Order. For example, the "summary reports" on the computer of the person in charge of Project P (Siddiqui) that were revealed at his July 22, 2014 deposition were not produced until December 2014. Also, 7-Eleven's counsel remarkably acknowledged on March 6, 2015 that counsel only recently learned from Messrs. Engen and Franks their broad view of Project P. (March 6, 2015 Tr. 114:23 to 115:8). Why counsel did not know this beforehand is inexplicable.

In response to the October 16, 2014 Order the Court does not expect perfection, nor does strict liability apply. Nevertheless, given the extent of 7-Eleven's deficiencies, the inescapable conclusion is that 7-Eleven made a lackluster and half-hearted effort to comply with the Order which resulted in a substantially deficient response. This is true despite the fact that 7-Eleven may have spent a lot of money on its searches. In sum, therefore, for the reasons discussed above, the Court finds

---

that answer. And I will be happy to do it as soon as I possibly can, and I'm sorry I can't do it today." <u>Id.</u> 95:6-9.

that 7-Eleven violated the October 16, 2014 Order thereby warranting sanctions pursuant to Rule 37(b)(2).[29]

## 2.   What Sanctions Should be Awarded?

Having decided that 7-Eleven should be sanctioned pursuant to Rules 26(g) and 37(b)(2), the Court must decide the appropriate sanctions to impose. Plaintiffs ask the Court to strike 7-Eleven's answer. This request for relief is denied because it is too severe. A default or dismissal is an "extreme" sanction, reserved for cases where a party has acted in "flagrant bad faith" and "callous disregard of [his] responsibilities." Nat'l Hockey League v. Metro Hockey Club, Inc., 427 U.S. 639, 643 (1976); United States v. $8,221,877.16 in U.S. Currency, 330 F.3d 141, 161, 163 (3d Cir. 2002)("As we have often noted, the sanction of dismissal is disfavored absent the most egregious circumstances" and "the resolution of any doubts [should be resolved] in favor of adjudication of the merits."). Further, the Third Circuit has expressed an aversion to the exclusion of important evidence. See Love v. Rancocas Hospital, C.A. No. 01-5456 (JEI), 2005 WL 6011252, at *2 (D.N.J. March 31, 2005).

---

[29] To the extent a further discussion is necessary, and for all the reasons discussed herein, the Court finds that 7-Eleven's failure to comply with the Court's October 16, 2014 Order was not substantially justified and no circumstances exist to make an award of expenses unjust.

Here, although substantially deficient, the Court does not find that 7-Eleven's behavior was so flagrant as to warrant a default, especially since less drastic sanctions may be awarded. It is true that 7-Eleven's conduct needlessly increased the cost of litigation. Nevertheless, the Court assumes that ultimately plaintiffs received most if not all of the discovery to which they were entitled. Since the time that plaintiffs' motion for sanctions was filed fact discovery has been completed, expert reports have been produced, and dispositive motions have been filed. Given these events it would not be equitable to strike 7-Eleven's answer at this juncture in the case. See In re Neurontin Antitrust Litigation, MDL Dkt. No. 1479, 2011 WL 253434, at *13 (D.N.J. Jan. 25, 2011)("'Just' sanctions are those that impose proportional discipline for the harm caused"); Wilkerson v. Brown, C.A. No. 96-4920 (JBS/AMD), 2009 WL 2049162, at *5 (D.N.J. July 8, 2009)(citation and quotation omitted) (emphasis omitted)("In the context of sanctions, it bears emphasis that the severity of the prejudice caused by the violation should be proportional to the sanction imposed in an effort to cure that prejudice."). All doubts should be resolved in favor of reaching a decision on the merits of the case. Liggon-Redding v. Willingboro Township, 351 Fed. Appx. 674, 678 (3d Cir. 2009). Thus, the request to strike 7-Eleven's answer is denied.

Having determined that the striking of 7-Eleven's answer to too severe, the Court has to decide what is appropriate. In this regard the Court should examine factors such as the severity of the transgression, whether it was intentional, negligent or inadvertent, and the timing and circumstances of the eventual document production. Tracinda Corp., 502 F.3d at 242. Other factors to consider are the nature and quality of the conduct at issue, whether the attorney or the client is responsible for the culpable conduct, whether there was a pattern of wrongdoing requiring a stiffer sanction, whether the wrongdoing actually prejudiced the wrongdoer's opponent or hindered the administration of justice, and the existence of mitigating factors. Minmetals, Inc. v. Dragon Boom, Ltd., C.A. No. 13cv3834 (KSH)(CLW), 2015 WL 1530913, at *3 (D.N.J. April 6, 2015). Since all sanctions originate from equity (Bull v. United Parcel Service, Inc., 665 F.3d 68, 83 (3d Cir. 2012)), the totality of the circumstances should be evaluated to determine the appropriate sanction. Appropriate or "just" sanctions may be a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances. Langer v. Monarch Life Ins. Co., 966 F.2d 786, 811 (3d Cir. 1992)(quotations omitted). Moreover, sanctions should be tailored to address the harm identified. Republic of Philippines

v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1995).

After evaluating the totality of the circumstances, the Court finds the appropriate sanction for 7-Eleven's Rule 26(g) violation is an admonition. 7-Eleven and its counsel are admonished that 7-Eleven's January 15, 2014 interrogatory answers violated Rule 26(g) and that similar conduct will be addressed more harshly in the future. See Rule 37(b)(2)(A)(if a party violates a discovery order the Court may issue "just orders"). As noted, 7-Eleven's conduct caused substantial case management and discovery problems. Nevertheless, the Court chooses not to impose a harsher Rule 26(g) sanction for several reasons. One, plaintiffs are not blameless for the incessant discovery problems in the case. After the Project P disputes came to the forefront plaintiffs' counsel could have done a better job "meeting and conferring" with 7-Eleven to resolve their disputes. Court intervention should be the last resort, not the first, to resolve a discovery dispute. Second, the Court will be imposing fees and costs under Rule 37(b)(2)(C) so a similar award under Rule 26(g) is largely cumulative. Three, the Court hopes and expects that its admonition will deter future similar conduct. And four, while mistakes were made the Court does not find that 7-Eleven acted willfully or intentionally to withhold relevant evidence.

As to the appropriate sanction pursuant to Rule 37(b)(2), the Court will Order 7-Eleven to reimburse plaintiffs for the fees and costs they incurred to obtain the discovery to which they were entitled and to assure 7-Eleven's compliance with the October 16, 2014 Order. See Rule 37(b)(2)(C). This sanction is especially appropriate here because the franchisees' resources have undoubtedly been strained by the unnecessary and incessant discovery disputes discussed herein.

Although the Court grants plaintiffs sanctions in the form of fees and costs, the Court wants to avoid satellite litigation regarding the amount to be awarded. The Court is not giving plaintiffs a "blank check" for all the work they did. See Martin v. Brown, 63 F.3d 1252, 1263-65 (3d Cir. 1995)(monetary sanctions should be reasonable and relate directly to the expenses incurred due to the non-complying party's violation). Therefore, the Court studied the record and identified in the first instance the work to be reimbursed.[30] If plaintiffs' counsel requests reimbursement for any other work, they shall show good cause for their application and the amount requested.

---

[30] The following work is reimbursable: (1) December 9, 2014 letter and affidavit [Doc. No. 153], (2) December 29, 2014 motion for sanctions [Doc. No. 163], (3) January 20, 2015 letter [Doc. No. 188], (4) January 23, 2015 deposition taken in accordance with the January 21, 2015 Order [Doc. No. 195], (5) January 23, 2015 telephone conference [Doc. No. 201], (6) January 27, 2015 letter [Doc. No. 205], and (7) May 18, 2015 supplemental brief [Doc. No. 330]. Also, the oral argument sessions regarding plaintiffs' Motion for Sanctions.

Plaintiffs shall note that only work done after October 16, 2014 may be reimbursable.

The Court acknowledges the <u>Sodhi</u> defendants (C.A. No. 13-3715) filed a "me too" motion for sanctions. Even though these parties did not take the "laboring oar" on the discovery disputes discussed herein, they will be given an opportunity to make an application for the fees and costs they incurred because of 7-Eleven's failure to comply with the October 16, 2014 Order. The application will be closely scrutinized to assure that 7-Eleven does not pay for duplicate work. The Court will grant these parties leave to serve an affidavit pursuant to L. Civ. R. 54.2 setting forth the work they want reimbursed and the amount.

The Court emphasizes that it takes no satisfaction in having to issue this Opinion. The Court ordinarily gives lawyers the benefit of the doubt and only reluctantly grants sanctions in extreme circumstances. Nevertheless, because of the persistent problems in the case, 7-Eleven's dreadful response to the October 16, 2014 Order, and the unfortunate negative impact 7-Eleven's conduct had on the Court's efforts to assure efficient case management, the Court is left with the firm conviction that fairness, equity and justice demand that sanctions be awarded.

Conclusion

Accordingly, for the foregoing reasons, the Motion for Sanctions filed by the Younes and Atalla plaintiffs is GRANTED in part and DENIED in part. The Court finds that plaintiffs violated Rule 26(g) and the Court's October 16, 2014 Order without substantial justification and that no circumstances exist to make a sanctions award unjust. Plaintiffs' request to strike 7-Eleven's answer is DENIED. Instead, the Court grants sanctions in the form of an admonition for 7-Eleven's Rule 26(g) violation. Sanctions in the form of an award of fees and costs is awarded under Rule 37(b)(2)(C) consistent with this Order. The Sodhi franchisees' motion for sanctions is also GRANTED in part and DENIED in part in accordance with this Opinion. An appropriate Order will be entered.

s/Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge

Dated: December 11, 2015